James Jerald ZARYCHTA, Appellant,

v.

The STATE of Texas, Appellee.

No. 01–95–00468–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

Aug. 29, 1997.

Discretionary Review Refused Jan. 28, 1998.

Thomas D. Moran, Houston, for appellant.

Daniel C. Rice, Gail Kikawa McConnell, Conroe, for appellee.

Before O'CONNOR, HEDGES and SMITH *, JJ.

## OPINION

O'CONNOR, Justice.

James Jerald Zarychta, the appellant, together with William Knoble, the appellant's brother, were charged with the capital murder of Jewel P. Madole during the burglary of Madole's home. The appellant was found guilty of capital murder by a jury. During the punishment phase, a jury found the appellant would probably commit violent criminal acts which would be a continuing threat to society, but the jury did not find the appellant intended to kill Madole or anticipated a human life would be taken. The trial court sentenced the appellant to life imprisonment. The appellant filed a motion for new trial, which was overruled by operation of law.

On appeal, the appellant complains the trial court erred in (1) overruling the appellant's hearsay and Confrontation Clause objections to the admission of Knoble's confession and (2) not giving the appellant credit for all time spent in custody before the entry of judgment. We reverse and remand.

## Appellant's Confessions

While in custody on March 11, 1993, the appellant made the following confession:

On Wednesday March 10th, my brother and I left Houston about 11:00 AM going to a friends house who lives in Montgomery County. We arrived there at about 11:45 AM. No one was home, so we left going North on FM 2978 toward Conroe. We were going to the outlet mall. We passed a housing subdivision to our left. My brother William Knoble said lets go through there so we turned in and was driving around about 10 minutes. Then we passed a house that was off the street and my brother William Knoble said "Stop, we can hit that house", so we stopped. I backed up and pulled into the driveway. It was a circle drive. I stopped in front of the house and my brother Will got out and went and knocked on the door. He also knocked on the window several times. He then turned to me and said, "Nobodys home". Will then started around the house. I backed up on the end of the house. Then my brother was already kicking in the back door. He then went into the house. I got out of the truck and went into an open door on the said [sic] of the garage. I came out of the garage and went inside the house and Will was going through everything in the bedrooms. I was in the living room getting the VCR, stereo, and speakers. I was putting it all in the truck when my brother came out with two rifles and at least one pistol. Then we both went back in the garage and I got a couple of saws, tools, etc. Will then tried to get an Air compressor but is [sic] shocked him so we left it and went back to the truck and then we left. We got about 5 miles from the house and Will kept saying lets go back. So we did. I backed in the same way as before. Will went back into the house. While I went back into the

---

* The Honorable Jackson B. Smith, Jr., retired Justice, Court of Appeals, First District of Texas at Houston, sitting by assignment.

garage. I was going to get the air compressor but Will hollered for me so I went into the house and he had already gotten the microwave and put it into the truck. Then I was in the kitchen and Will was in the bedroom and I heard a door shut. I hollered, "Will, someone is here". He came into the kitchen and saw a man walking around behind my truck and the guy entered the house and Will pulled a 9mm from his pants. He cocked it one time. Then the man took off running into a thinned wooded area. Will was chasing him. I was hollering **"Stop Will, don't shoot him, come on"**. Will then fired one shot and I jumped out of the truck and hollered again **"Come on, don't kill him"**. I then heard the man yell, "Don't shoot me, I won't tell anyone". Will then fired several shots at the guy then ran and jumped into the truck. We left and took all of the stuff to my cousins house....

(Emphasis added).

A few days later, the appellant made a second confession regarding an incident at a Conoco station that occurred two weeks before. According to the appellant's confession, Knoble told the appellant to stop at a Conoco station. The appellant initially drove over to the right side of the gas station. Knoble walked over to the pay phone and then told the appellant to pull up to the next driveway. The appellant became suspicious of what Knoble was doing. Knoble pulled into the driveway; however, it was too muddy, so he pulled into another driveway. The appellant got out of his vehicle, and then Knoble ran out of the Conoco hollering, "Come on I shot him." The appellant and Knoble ran to the appellant's truck and left. The appellant told Knoble he should not have shot the man at the Conoco. The appellant realized Knoble used the .38 caliber pistol that the appellant had removed from the appellant's glove compartment one week earlier.

### Knoble's Confession

While in custody on March 12, 1993, Knoble made the following confession:

My name is William D. Knoble and I am 15 years of age.... On Wednesday, two days ago, me and my brother James broke into a house near Magnolia, but I am not positive. There was a circle drive with a garage next to the house. My brother's name is James Zarychta. We were in his 93 Ranger Truck. The first time we pulled up, we pulled up to the front. I went to the door and knocked. No one answered. James then backed his truck to the front of the garage. I waited in the truck while James looked in the window. James went into the garage and came out and told me to come in there. James and I took some things like a jig saw, a pair of bolt cutters. James then kicked the door down at the back of the house and we both went inside. James went into the living room and kitchen while I went into the main bedroom. In there, I found a .12 ga. double barrel, two or three .22 cal rifles. I went back into the bedroom and looked in the top chest drawers and found and took a .22 cal pistol. I left out to the truck with the stuff. I also grabbed portable phone. James and I loaded the stuff in the truck and we left.

After we left, we decided to come back. When we came back, James got a microwave from the kitchen. James came back in and told me someone was outside. I then saw a man walk into the kitchen door that James had kicked. I pulled out my Ruger 9mm pistol and cocked it. The man took off running. **James was in the truck already and hollering for me to shoot him.** I shot at the man as he was running. I shot once and did not hit the man. He kept on running. **James told me to shoot again.** I then shot a bunch of times out of the Ruger. When I stopped shooting, I saw the man fall to the ground. He was saying, "Please don't shoot me!" I asked him if he got my license plate number! He said no. I ran back to James truck, got in and we left. **James asked me if I made sure he was dead.** I said I did not know. James and I went to Eddie's house and dropped off everything out of the house. **James did not shoot the pistol at the old man. Only I did.**

(Emphasis added).

During the guilt/innocence phase, the State called Knoble as a witness. Knoble refused

to testify by asserting his right under the Fifth Amendment.[1] Knoble stated even if he were granted immunity, he would refuse to testify.

Outside the jury's presence, the State questioned Detective Hidalgo about how Knoble's confession was obtained. The State then moved to admit Knoble's confession. Defense counsel objected to its admission on the grounds (1) it was hearsay and was not a declaration against penal interest;[2] (2) its admission would violate the appellant's right to confront Knoble as guaranteed by the United States Constitution[3] and Texas Constitution;[4] and (3) the particular statement by Knoble that the appellant told him to shoot the victim was not reliable under rule 803(24). The trial court overruled the objections and admitted Knoble's confession, noting it was against Knoble's penal interest and was sufficiently corroborated by other evidence. When the jury was recalled, the State introduced the statement. The appellant's counsel reurged his objection to its admission, and the trial court again overruled his objection.

### Declaration Against Penal Interest

■■■ In point of error one, the appellant complains the trial court erred in overruling his objections to the admission of Knoble's confession because it was hearsay and was not a statement against Knoble's interest. A trial court has broad discretion in determining the admissibility of the evidence, and we will not reverse its decision on appeal unless a clear abuse of discretion is shown. *Allridge v. State,* 850 S.W.2d 471, 492 (Tex. Crim.App.1991); *Simpson v. State,* 886 S.W.2d 449, 451 (Tex.App.—Houston [1st Dist.] 1994, pet. ref'd).

Rule 803(24) of the Criminal Rules of Evidence provides that a statement against interest is not excluded by the hearsay rule even though the declarant is available as a witness. Tex.R.Crim.Evid. 803(24). A statement against interest is:

A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, or to make him an object of hatred, ridicule, or disgrace, that a reasonable man in his position would not have made the statement unless he believed it to be true.

Tex.R.Crim.Evid. 803(24). However, a statement against the declarant's penal interest is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement. Tex.R.Crim.Evid. 803(24). The Court of Criminal Appeals has adopted the United States Supreme Court's view of the federal counterpart to Rule 803(24):

[T]he most faithful reading of Rule 804(b)(3) is that it does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory.

*Miles v. State,* 918 S.W.2d 511, 515 (Tex. Crim.App.1996) (quoting *Williamson v. United States,* 512 U.S. 594, 600–01, 114 S.Ct. 2431, 2435, 129 L.Ed.2d 476 (1994)); *Cofield v. State,* 891 S.W.2d 952, 956 (Tex.Crim.App. 1994).

■■■ According to the *Williamson* Court, "[t]he fact that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts." 512 U.S. at 599, 114 S.Ct. at 2435. However, the Court did state, "the confessions of arrested accomplices may be admissible if they are truly self-inculpatory, rather than merely attempts to shift blame or curry favor [with the authorities]." *Id.* at 603, 114 S.Ct. at 2436. Whether a statement is self-inculpatory can only be determined by viewing it in context. *Lee v. Illinois,* 476 U.S. 530, 545, 106 S.Ct. 2056, 2064, 90 L.Ed.2d 514 (1986) A defendant's confession is presumptively unreliable as to those portions which detail a co-defendant's conduct or culpability because those portions

---

1. Knoble's attorney stated Knoble was the appellant's co-defendant and was currently appealing his conviction.

2. Tex.R.Crim.Evid 803(24).

3. U.S. Const. amend. 5.

4. Tex. Const. art. I, § 10.

may be the result of the defendant's desire to shift the blame, curry favor, avenge himself, or divert attention to another. *Lee,* 476 U.S. at 545, 106 S.Ct. at 2064; *Cofield,* 891 S.W.2d at 956. A co-defendant's statements about what the defendant did or said are less credible than ordinary hearsay evidence. *Lee,* 476 U.S. at 541, 106 S.Ct. at 2062. Further, a co-defendant's confession is not necessarily made reliable in its entirety simply because some of the facts it contains "interlock" with the facts in the defendant's statement. *Lee,* 476 U.S. at 545, 106 S.Ct. at 2064. The true danger inherent in such hearsay is its selective reliability. *Id.*

The State argues Knoble's confession is wholly self-inculpatory, and Knoble did not attempt to shift blame or curry favor the authorities. That is, the State argues Knoble's statements about the appellant should not be transformed from statements against penal interest into inadmissible statements merely because they name the appellant. *See Williamson,* 512 U.S. at 605–07, 114 S.Ct. at 2438 (Scalia, J., concurring). Knoble's confession does more than merely name the appellant.

Although Knoble admits in his confession that only he shot the victim, Knoble also states the appellant told him to shoot him: "James was in the truck already and hollering for me to shoot him.... James told me to shoot again." The State insists Knoble took full responsibility for the crime. We disagree. Although Knoble may have inculpated himself by admitting he was the only one who shot the victim, Knoble's statement that the appellant told him to do it adds nothing to his own culpability. The opposite is true. Knoble's statements that the appellant told him to do it inculpated *the appellant* as a party because they indicate the appellant encouraged the shooting. Knoble's statements, which can be likened to "the devil made me do it," are an attempt to shift the blame to the appellant to minimize Kno-

ble's criminal exposure. Rule 803(24) does not provide a hearsay rule exception for a declarant's statement that is against someone else's interest. *Cofield,* 891 S.W.2d at 955.[5]

Because Knoble's statements that the appellant told him to shoot the victim do not inculpate Knoble, the declarant, but rather inculpate the appellant, the accused, we find they were inadmissible hearsay and not a declaration against the Knoble's interest. The trial court erred when it admitted the statements which inculpated the appellant instead of Knoble.

### Harm Analysis

 Unless we can determine beyond a reasonable doubt that the error did not contribute to the conviction or to the punishment, we must reverse the judgment. *Miles,* 918 S.W.2d at 516. Whether the error is harmful depends on a number of factors set out in *Harris v. State,* 790 S.W.2d 568, 587–88 (Tex.Crim.App.1989): (1) the source of the error; (2) the nature of the error; (3) whether or to what extent it was emphasized by the State; (4) its probable collateral implications; (5) how much weight a juror would probably place upon the error; and (6) whether declaring the error harmless would encourage the State to repeat it with impunity. *Id.* When conducting a harm analysis, we must look at the totality of the record, and the predominant concern is the error and not whether there is overwhelming evidence to support the defendant's guilt. *Miles,* 918 S.W.2d at 517.

*1. The source of the error*

 The State was the source of the error when it asked Detective Hidalgo to read Knoble's confession into the record.

*2. The nature of the error*

The nature of the error was the admission of inadmissible hearsay that proved one of

---

5. The State relies on *McFarland v. State,* 845 S.W.2d 824 (Tex.Crim.App.1992), a case in which no blame-shifting was found to have occurred when a witness testified an accomplice told the witness that the accused killed a victim, but somebody else would get blamed for it. *McFarland* predates *Williamson* and *Cofield* and

does not involve a co-defendant's custodial confession. Moreover, Justice Baird recently stated *McFarland* should be overruled to the extent "it holds non-conspiratorial statements of accomplices are admissible under Rule 803(24)." *Miles,* 918 S.W.2d at 518 n. 2 (Baird, J., concurring).

the elements of the State's charge against the appellant. Knoble's confession contained the statement that the appellant told Knoble to shoot the victim. The appellant's confession differs significantly from Knoble's confession in that the appellant claims he told Knoble *not* to shoot the victim. Given that Knoble confessed to being the sole trigger person, to convict the appellant of capital murder, the State had the burden of proving, beyond a reasonable doubt, that the appellant, with the intent to assist the commission of capital murder, encouraged Knoble to shoot the victim. *See* TEX. PENAL CODE §§ 7.02(a)(2) & 19.03 (1993). Thus, Knoble's statements indicating that the appellant told Knoble to shoot the victim were a crucial and convenient source of such evidence.

### 3. The extent the error was emphasized by the State

The error was repeatedly emphasized by the State. During arguments at the guilt/innocence stage, the State urged the jury to look at Knoble's statements regarding the appellant on at least three occasions. On one occasion, the State said:

> Did Mr. Zarychta aid, abet, encourage, direct William Knoble in the death of Jewel P. Madole? Yes. Where is that? Look at William Knoble's statement. It's simple. Shoot him, shoot him, shoot him. Kill him.

On another occasion, the State said:

> How could there be any—how could there be any doubt, when you read Mr. Knoble's statement. And I beg you, right closely, very closely where the admission is, he [the appellant] said it. Shoot him. Shoot him, shoot him.

### 4. The weight a juror would probably place upon the error

The jury probably placed a great deal of weight on Knoble's statement. The only other evidence which would suggest the appellant encouraged or aided the shooting came from a receipt for the sale of a box of 9 millimeter Blazer ammunition. (State's Exhibit 50). Officer Kirk Gray Ervin testified he found the receipt in the appellant' truck while he was searching it pursuant to a search warrant. Carol Wise, a customer services manager at the Academy Sporting Goods Store in Tomball, testified she recognized the sales receipt which indicated she sold a box 9 millimeter Blazer ammunition on March 10, 1993, at 11:37. Fourteen days after she sold the ammunition, she was able to identify the appellant in a line-up as the individual to whom she sold the ammunition. She was able to identify the appellant because she had asked to look at his identification before she sold him the ammunition. She also was able to identify the appellant in the courtroom.

Officer Emmons, who is with the identification division of the Montgomery County Sheriff's Office, testified he processed the sales receipt for fingerprints. Emmons further testified the fingerprint on the receipt was made by the left middle finger of the appellant.

Although the State also introduced the appellant's confession regarding the shooting at the Conoco station that occurred about two weeks before the homicide, that incident involved a different pistol and did not indicate the appellant knew Knoble was going to shoot anybody at the Conoco station.

### 5. The probable collateral implications of the error

The collateral implications are that the error relieved the State of its burden of proving beyond a reasonable doubt that the appellant, with the intent to assist the commission of capital murder, encouraged Knoble to shoot the victim. *See* TEX. PENAL CODE §§ 7.02(a)(2), 19.03 (1993).

### 6. Likelihood the State will repeat the error

If we find the error harmless, the State has no incentive to correctly read and apply Rule 803(24) and the cases that interpret it.

In summary, we cannot say beyond a reasonable doubt that the erroneous admission of the statements made no contribution to the appellant's conviction for capital murder.

Accordingly, we sustain point of error one.[6]

### Credit for Custody

In point of error four, the appellant complains the judgment does not reflect the proper amount of jail time which should be credited against his sentence. That is, the judgment reflects the appellant was given 320 days credit on his sentence; however, the judgment does not reflect an additional year which the appellant spent in custody. The appellant's complaint is now moot because the trial court reformed the judgment to reflect this additional year. Accordingly, we overrule point of error four.

The trial court's judgment is reversed, and the cause is remanded to the trial court for further proceedings consistent with this opinion.

---

6. Because of our disposition of point of error one, we need not address points of error two and three.